IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

UNITED STATES OF AMERICA )
                         )
         v.              )    1:05CR112
                         )
OKANG KAREEM ROCHELLE    )

**MEMORANDUM OPINION AND ORDER**

THOMAS D. SCHROEDER, District Judge

This matter is before the court on Defendant Okang Kareem Rochelle's Motion to Suppress a pistol and a rifle seized during a search of his car by officers of the North Carolina Department of Corrections and the Guilford County, North Carolina, Sheriff's Office while Rochelle was observed video-taping prisoner exchanges.[1] (Doc. 85.) An evidentiary hearing was held on February 2, 2009. For the reasons set forth below, the motion is DENIED.

**I.   BACKGROUND**

The following evidence was presented by the Government at the evidentiary hearing, which the court finds credible, and constitutes the court's findings of fact.

Sergeant Ricky Allen of the North Carolina Department of Corrections ("DOC") testified at the February 2, 2009, hearing.

---

[1] Rochelle was indicted in a two count indictment for being a felon in possession of a firearm, violations of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). (Doc. 1.)

Allen is a 29-year employee of the DOC and is the supervisor of the DOC's Fugitive and Narcotics Section and the Transportation Section. He has worked at the Sandy Ridge Transfer Terminal[2] for 23 years.

On November 2, 2004, Allen was at the Transfer Terminal, which is a facility located near High Point, North Carolina, used by DOC to ship between 400 and 500 minimum and medium custody felony inmates throughout the state. Transfers are only conducted two days a week, on Tuesdays and Thursdays. The facility has three large holding cells capable of housing between 450-600 inmates, and the main office is located next to the holding cells.

At around 1:00 p.m. on Tuesday, November 2, 2004, Allen was in the main office when he was alerted that a DOC bus driver had observed a man standing by the side of the road leading to the Transfer Terminal. The bus driver reported that the man had a video-camera and appeared to be recording prison buses as they exited the Transfer Terminal. The man in question was standing in front of a residence located approximately 200 to 300 yards from the Transfer Terminal. The road to the Transfer Terminal is residential, does not have any other commercial properties on it, and is in a "kind of rural" area. Allen drove to the

---

[2] The Sandy Ridge Transfer Terminal is located on what had been the Sandy Camp Correctional Center, a minimum-security prison for adult males.

residence, flashed his amber lights and parked by the side of the road. He noticed that the African-American male was "doing something under the back seat of the vehicle." Allen exited his vehicle and approached the man, whom he identified in court as Rochelle, standing beside a vehicle that was backed into the driveway of the residence. Rochelle was holding a video-camera in one hand and had a walkie-talkie. The driver's side doors of Rochelle's car were open. As Allen approached him on foot, Rochelle placed the video-camera on top of his vehicle but apparently let it continue to record.

In his 23 years of working at the Transfer Terminal, Allen had never observed anyone video-taping prison buses without permission or standing outside the Transfer Terminal with a walkie-talkie. Allen knew that the residence in front of which Rochelle parked was not occupied because its elderly female occupant had recently moved to a group home. Moreover, next to the house was a large metal dumpster used to dispose of large items of trash. There were no signs in the yard indicating the house was available for sale or rent.

Allen approached Rochelle and asked him what he was doing. Rochelle gave equivocal answers, first denying that he was video-taping the prison buses leaving the Transfer Terminal and later claiming instead that he was working on a documentary film of prison life. Rochelle was standing approximately 200 to 300

3

yards away from the Transfer Terminal. The facility is surrounded by double fences with two towers housing armed DOC guards on opposite corners. According to Allen, from where Rochelle was standing he had a clear view of the armed DOC guards manning the two watch towers as well as the guards organizing the prisoner transfer.

While speaking to Rochelle, Allen could see inside the open door on the driver's side of Rochelle's vehicle and observed in plain view a crossbow sitting between the driver and passenger seats. The crossbow was loaded and ready to fire. Allen knew from his experience as a wildlife instructor and hunter educator that it was a violation of North Carolina law to purchase or receive a crossbow without a permit. See N.C. Gen. Stat. §14-402(a).[3] Allen questioned Rochelle as to whether he possessed a license for the crossbow, and Rochelle said he had one but produced his driver's license instead and claimed it was a child's crossbow. Allen testified that based on his experience, from looking at the crossbow "it had 50 pounds of pull" and

---

[3] A crossbow is defined by statute as: "A mechanical device consisting of, but not limited to, strings, cables, and prods transversely mounted on either a shoulder or hand-held stock. This device is mechanically held at full or partial draw and released by a trigger or similar mechanism that is incorporated into a stock or handle. When operated, the crossbow discharges a projectile known as a bolt." N.C. Gen. Stat. § 14-402(c)(3). In this respect, the crossbow projectile differs from an arrow. The requirements upon purchase or receipt of a crossbow are the same as those applicable to a pistol. N.C. Gen. Stat. § 14-402(a).

4

"would still launch an arrow pretty good toward one of my officers on that tower."

Upon seeing Rochelle with the video-camera, walkie-talkie, and crossbow, Allen was concerned for the safety of the guards in the towers as well as those facilitating the prison transfer. He was also concerned that, given these items and the proximity to the prison transfer location, Rochelle could be facilitating a possible prison break or assault on persons in DOC custody. Allen was particularly worried because a crossbow was a weapon that would not produce any report when fired.

Allen asked for Rochelle's license and registration. He returned to his vehicle and determined that there were no abnormalities with them, nor were there outstanding warrants for Rochelle's arrest. Allen also requested backup from the Guilford County Sherriff's Department ("GCSD"). During this time, Rochelle resumed use of his video-camera and began to narrate events as they unfolded.

Approximately ten to fifteen minutes after Allen had made contact with Rochelle, GCSD Officer G.T. Johnson arrived. Johnson, then a 34-year veteran active duty officer and supervisor of the legal section of the civil division, is now a sworn active reserve officer.

Johnson arrived and observed Rochelle standing next to his vehicle filming prison buses driving by with a video-camera in

his right hand and a walkie-talkie in his left hand. Johnson stepped out of his patrol car and walked toward Rochelle, followed closely by Allen. Rochelle left his video-tape camera running as he placed it on the roof of his car. The tape, which was introduced by the Government during the hearing, showed Johnson approaching Rochelle and the events to follow.[4] Allen testified that he told Johnson about the crossbow, and on the tape Allen can be heard warning Johnson that Rochelle had a loaded crossbow in the front seat as Johnson walked past Rochelle's open driver's side car door to approach Rochelle.[5]

Johnson immediately began to question Rochelle concerning his video-taping of the prisoner Transfer Terminal. Johnson explained that in order to video-tape a DOC facility, Rochelle needed permission from its Raleigh headquarters. Johnson also testified that he was concerned about Rochelle's involvement in

---

[4] At the hearing, Officer Robert Elliot of the GCSD presented the video-tape that was recovered from Rochelle's video-camera. (The portions of the video-tape dealing with the instant interaction were transferred onto a DVD.) The video-tape, played at the hearing, revealed that during the course of the encounter the driver's side front and back doors of Rochelle's vehicle were open and a constant beeping sound indicating the presence of keys in the ignition could be heard. It also showed that in response to Johnson's question about what he was doing there, Rochelle responded that his car had overheated and he had stopped to ask the man who owned the property about renting the house. The video-taped footage revealed that the front door of the house had been boarded up.

[5] Johnson originally testified that he was unaware of the crossbow until after the pat-down frisk. The video-tape clearly shows Allen telling Johnson about the crossbow as the two walked toward Rochelle before the frisk, however. When shown the video-tape to refresh his recollection, Johnson testified that the events in the video-tape accurately reflected the sequence of events.

6

a possible escape and/or assault on DOC personnel. Johnson asked whether Rochelle owned the property he was standing on. Rochelle responded that he did not but claimed that he had spoken to the man who owned it, who he said had just left, about possibly renting the house. Rochelle said that the man told him it was being renovated and was going to be rented to someone else.

Johnson testified that "due to his location and the risk of involvement of possible escape attempt or assault on DOC personnel" he asked whether Rochelle had any weapons on him. Rochelle immediately asked whether Johnson had a warrant. Johnson explained that he was merely conducting a pat-down frisk "for his protection and mine for weapons."

Rochelle initially refused to submit to the frisk but complied upon Johnson's second request. Johnson's frisk quickly revealed an empty holster underneath Rochelle's shirt on his waist band. Johnson knew from his training and experience that empty holsters indicate the presence of a weapon. Having found the empty holster, he asked Rochelle where the holster's weapon could be found. Rochelle said it held a BB gun which was underneath the driver's seat. Johnson then informed Rochelle that he would have to be secured until the weapon was located. As Johnson pulled Rochelle's right arm behind his back to handcuff him, Rochelle pushed Johnson away and attempted to run.

7

Johnson, Allen, and Sgt. Anthony Wray, a DOC officer who had also arrived, tackled Rochelle to the ground, but Rochelle continued to resist. Johnson eventually had to use pepper-spray to subdue and secure Rochelle. Johnson also put Rochelle in leg shackles to prevent him from fleeing and placed him in the back of a patrol vehicle.

The fact that Rochelle was using a walkie-talkie had raised Allen's concern that Rochelle was working in concert with someone else nearby. So, when other officers arrived, Allen directed them to search the woods surrounding the residence to determine whether anyone was working with Rochelle.

A search of Rochelle's vehicle revealed the following in the passenger compartment: a loaded pistol-grip crossbow next to the driver's seat; a .22 caliber pistol concealed in a green sock under the passenger seat; and a BB pistol under the driver's seat. Officers also located a .44 caliber rifle wrapped in a blue towel and some ammunition in the trunk of Rochelle's vehicle.[6]

## II. ANALYSIS

Rochelle moves to suppress the firearms seized from his car on the grounds that the pat-down frisk and subsequent search of his vehicle violated his Fourth Amendment right to be free of

---

[6] The Government states that officers also recovered from Rochelle's vehicle a handwritten list of the names of three DOC inmates and their respective DOC prison facilities. (Doc. 87.)

unreasonable searches and seizures. (Doc. 85 at 3.) Rochelle argues that Johnson lacked reasonable suspicion to conduct a pat-down or frisk because the "unusual behavior of [Rochelle] filming a documentary about prisoners in the vicinity of a prison facility but not on governmental property is not illegal." (Doc. 86 at 3.)

### A. *Terry* Frisk

The Fourth Amendment protects individuals against "unreasonable searches and seizures."[7] U.S. Const. amend. IV. "The Supreme Court has recognized three distinct types of police-citizen interactions: (1) arrest, which must be supported by probable cause; (2) brief investigatory stops, which must be supported by reasonable articulable suspicion; and (3) brief encounters between police and citizens, which require no objective justification." United States v. Weaver, 282 F.3d 302, 309 (4th Cir. 2002). When a police officer "observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot," the officer may temporarily seize and detain a citizen. Terry v. Ohio, 392 U.S. 1, 30 (1968). An investigatory stop is consistent with the Fourth Amendment if, based on the totality of the circumstances, the officer has a "particularized and

---

[7] The Fourteenth Amendment incorporates the rule excluding evidence obtained through an illegal search or seizure and makes it applicable to the states. Mapp v. Ohio, 367 U.S. 643, 655 (1961).

9

objective basis for suspecting legal wrongdoing." United States v. Arvizu, 534 U.S. 266, 273 (2002). Under a totality of the circumstances analysis, even if "each . . . factor alone is susceptible of innocent explanation," taken in the aggregate the factors may be sufficient for an officer to form a "particularized and objective basis" providing reasonable suspicion for an investigative stop. Id. at 277-78.

If in connection with such a seizure or stop the officer is presented with a reasonable belief that the person may be armed and presently dangerous, the officer may conduct a protective frisk. Arizona v. Johnson, No. 07-1122, slip op. 5 (Jan. 26, 2009); Adams v. Williams, 407 U.S. 143, 146 (1972); United States v. Black, 525 F.3d 359, 364 (4th Cir. 2008); United States v. Jones, 289 F. App'x 593, 597 (4th Cir. 2008)(noting that during a Terry stop, a pat-down frisk is permitted when the officer perceives an appropriate level of suspicion of criminal activity and apprehension of danger). Thus, under Terry police officers are authorized to "stop a person who is behaving suspiciously to question him briefly and, if the officers believe the person is armed, to pat-down or frisk him for weapons if the officers have a reasonable suspicion, based on articulable, particularized facts, that criminal activity may be afoot." United States v. McCoy, 513 F.3d 405, 411 (4th Cir. 2008)(internal citations and quotations omitted).

10

Here, while Rochelle was already stopped and filming DOC operations as Allen approached him, the encounter initially began as one of "police-citizen." The evidence indicates that Rochelle was not detained (revealed in part by Rochelle's continued video-taping), and Allen's check of Rochelle's license did not alter that conclusion. <u>United States v. Williams</u>, No. 99-4306, 2000 WL 1421327, at *3 (4th Cir. Sept. 27, 2000). The situation eventually developed into an investigatory stop leading to a frisk. The facts easily gave rise to a reasonable suspicion that criminal activity may have been afoot. Officers were alerted to a man with a video-camera recording (in violation of DOC policy) prison buses containing convicted felons as they left a prison transfer facility -- an event that occurred only on certain days and thus suggested advance planning -- in a rural, somewhat secluded area that saw little traffic otherwise. While he was filming, Rochelle communicated to someone on a short-range walkie-talkie he held in his hand, and a loaded 50-pound pull crossbow -- capable of reaching the prison guards as well as passing prison buses -- was readily visible and accessible through the open door to the front seat of the car. A crossbow is particularly troublesome because, unlike a firearm, it can be discharged without any report. The house in front of which Rochelle was parked was also known to be abandoned and was close to the DOC prison facility. Rochelle

11

also gave increasingly inconsistent stories about why he was there, which contradicted what Allen knew about the resident of the house. Rochelle had positioned his vehicle to flee the scene quickly: it was backed into the driveway, and Rochelle was standing next to it with its driver's-side front and rear doors open and the keys in the ignition. Allen had also observed Rochelle "doing something under the backseat of the vehicle" as he arrived. In his 23 years of working for the DOC, Allen had never encountered anyone video-taping the dispatch of transfer buses without permission.

The evidence could be interpreted by a reasonable officer to indicate an attempt to assist in a prison break, a coordinated effort to disrupt the operations of an inmate transfer process, or a possible assault on a prisoner or guard. Moreover, the presence of the loaded crossbow, alone and in conjunction with the other suspicious behavior of potential criminal activity, raised a reasonable suspicion that Rochelle may have been armed and dangerous. See United States v. Spratley, 138 F. App'x 571, 571-72 (4th Cir. 2005)(holding officers possessed reasonable suspicion to seize and frisk a defendant based on the totality of the circumstances which included "the unusual manner in which he parked his car, his nervous behavior, the bulge in his pocket, and the gun in plain view in his car"). Thus, although some of the enumerated acts

12

may have had an innocent explanation when viewed separately, as Rochelle argues, the Government need not rule out the possibility of innocent conduct, Arvizu, 534 U.S. at 277, and in the aggregate they gave officers a "particularized and objective basis" to conclude that criminal activity may have been afoot and that Rochelle may have been armed and dangerous, thus providing grounds to detain and frisk. Terry, 392 U.S. at 30.

Rochelle insists that neither Johnson nor Allen testified that they feared for their own safety, rendering the pat-down frisk unjustified. First, Rochelle overlooks Johnson's testimony that he conducted the pat-down frisk for his safety and Rochelle's. That Allen declined to conduct further investigation without back-up supports a finding of fear of officer safety. Second, the court's inquiry in Fourth Amendment challenges does not turn on the subjective motivations of the officers involved but is an objective inquiry into whether a reasonable officer would be justified in taking the action. Whren v. United States, 517 U.S. 806, 813 (1996)("the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action")(internal quotations and citations omitted); United States v. Sakyi, 160 F.3d 164, 169 (4th Cir.

13

1998)(holding justification for pat-downs "may be satisfied by an officer's objectively reasonable suspicion"). The objective evidence before the court shows a reasonable officer would have possessed an appropriate level of suspicion of criminal activity and apprehension of danger. Third, the court can look to the collective facts constituting reasonable suspicion to conduct a warrantless stop or search. <u>United States v. Wheeler</u>, No. 08-4582, 2008 WL 5070545, at *1 (4th Cir. Dec. 1, 2008)("reasonable suspicion may be based on the collective knowledge of officers involved in an investigation")(citing United States v. Hensley, 469 U.S. 221, 231 (1985)); <u>United States v. Sherman</u>, No. 07-5029, 2008 WL 4908597, at *1 (4th Cir. Nov. 17, 2008)("Reasonable suspicion requires more than a hunch but less than probable cause, and may be based on the collective knowledge of officers involved in an investigation"). The collective knowledge of the officers at the scene provided a reasonable basis to believe Rochelle was armed and dangerous, thus a pat-down frisk was justified. <u>Terry</u>, 392 U.S. at 30.

Rochelle's reliance on <u>United States v. Burton</u>, 228 F.3d 524 (4th Cir. 2000), to argue Johnson's pat-down frisk was an unreasonable search of his person in violation of his Fourth Amendment rights is unwarranted because <u>Burton</u>, which dealt with an citizen-officer encounter, is readily distinguishable. In <u>Burton</u>, the defendant was standing at a pay telephone outside a

14

convenience store when four police officers, who were in the area serving outstanding warrants, approached him. 228 F.3d at 525. The officers repeatedly requested identification from Burton, who refused to respond. Id. They then asked Burton to remove his hand from his coat pocket, and when he failed to do so they reached into his coat and grabbed his hand. Id. A struggle ensued, and Burton was wrestled to the ground. Id. Burton then pointed a handgun at one of the officers and attempted to fire it, but it jammed. Id. One of the officers testified that he had no reason to believe that Burton was involved in any kind of disturbance or illegal activity upon their encounter, but that Burton's refusal to remove his hand from his pocket made him "uneasy about our safety." Id. at 528. The Fourth Circuit held that there was no evidence of record that established a reasonable suspicion that criminal activity was afoot. In the absence of such reasonable suspicion, a frisk was not justified. Id. at 529. In the present case, by contrast, the officers were confronted with sufficient evidence supporting a reasonable suspicion that Rochelle may have been involved in criminal activity and, given the presence of the loaded crossbow by the driver's seat, that he may have been armed and dangerous.

15

**B. Vehicle Search**

Police officers conducting a Terry stop may carry out a protective search of a suspect's vehicle if they have a reasonable belief that the suspect is dangerous and may gain immediate control of weapons inside the vehicle. Michigan v. Long, 463 U.S. 1032, 1049-50 (1983)(internal citations and quotations omitted). The protective vehicle search is authorized even if the suspect is under police restraint at the time of the search. United States v. Elston, 479 F.3d 314, 320 (4th Cir. 2007).

Johnson's detention of Rochelle after conducting a pat-down frisk was a "brief but complete restriction of liberty" valid under Terry. United States v. Leshuk, 65 F.3d 1105, 1109-10 (4th Cir. 1995)("drawing weapons, handcuffing a suspect, placing a suspect in a patrol car for questioning, or using or threatening to use force does not necessarily elevate a lawful stop into a custodial arrest"). The officers were authorized to conduct a protective search of the passenger compartment of Rochelle's vehicle pursuant to which they recovered a fully-loaded .22 caliber pistol in a green sock from underneath the passenger seat and the loaded crossbow in plain view next to the driver's seat. Long, 463 U.S. at 1049-50.[8]

---

[8] The Government states in its brief that the .44 magnum rifle, .22 caliber pistol, boxes of ammunition, crossbow, and BB gun were

16

With respect to the .44 magnum rifle wrapped in a blue towel in the trunk of Rochelle's car, warrantless searches of a vehicle are authorized if officers possess probable cause to believe the vehicle contains contraband. United States v. Carter, 300 F.3d 415, 421 (4th Cir. 2002)(citing California v. Carney, 471 U.S. 386, 392 (1985)). The pistols and loaded and cocked crossbow found in the passenger compartment provided probable cause for the officers to search the trunk. United States v. Carico, No. 07-4745, 2008 WL 5586719, at *2 (4th Cir. Dec. 19, 2008)(holding multiple weapons and a large quantity of cash found during initial search of vehicle provided probable cause for more thorough search of vehicle, including the trunk); see United States v. Miller, 265 F. App'x 5, 8 (2d Cir. 2008)(loaded .45 caliber gun magazine found in glove compartment provided probable cause to search trunk); United States v. Jackson, 415 F.3d 88, 99 (D.C. Cir. 2005)(finding drugs or guns in the passenger compartment of a car gives rise to probable cause to search the trunk for additional contraband). Therefore, the .44 magnum rifle (and ammunition) found in the trunk of Rochelle's car was not the fruit of an unlawful search.

---

retrieved as part of an inventory search of Rochelle's car incident to his arrest for resisting an officer. (Doc. 87 at 4.) While this may be true, no testimony as to the details of Rochelle's arrest was presented at the evidentiary hearing. Therefore, the court proceeds with the analysis as a protective search conducted as part of the Terry stop without prejudice to the Government's right to also argue its legality as a post-arrest search.

17

**III. CONCLUSION**

Having considered all of Rochelle's arguments in support of his Motion to Suppress and for the foregoing reasons, IT IS OREDERED that the Motion to Suppress (Doc. 85) is DENIED.

                                                          /s/ Thomas D. Schroeder
                                                  United States District Judge

February 12, 2009